STATE OF MAINE
YORK, ss.

SUPERIOR COURT
Civil Action
DOCKET NO. CV-16-0203

INFOSECURUS, INC., )
)
VINCENT SHELZI, )
)
and )
)
JOSEPH SHELZI, )
)
        Plaintiffs, )
)
        v. )
)
GLENN PETERSON, )
)
and )
)
CANUVO, INC., formerly SAFE )
HARBOR MAINE, INC., )
)
        Defendants. )

**ORDER ON DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT**

## I.    BACKGROUND

This case is an employment discrimination action brought by plaintiffs Infosecurus, Inc. ("Infosecurus"), Vincent Shelzi ("Vincent"), and Joseph Shelzi ("Joseph") (collectively, the "Shelzis") against defendants Glenn Peterson ("Glenn" or "Peterson") and Canuvo, Inc. ("Canuvo"), formerly Safe Harbor Maine, Inc. Plaintiffs seek to enforce the terms of an oral contract for submission of an application for a license to operate a medical marijuana dispensary, and, if the application was granted, an ongoing business relationship for the operation of the dispensary.

1

Vincent is the President and sole owner of Infosecurus, which provides consulting services in the information security industry. (Supp.'g S.M.F. ¶¶ 1-2.) Joseph is Vincent's brother but is not an owner, officer, or employee of Infosecurus. (Supp.'g S.M.F. ¶¶ 3-4.)

Defendant Peterson is the President of Canuvo, a nonprofit corporation organized under the Maine Nonprofit Corporation Act, Title 13-B M.R.S.A., for the operation of a registered dispensary under the Medical Use of Marijuana Act, 22 M.R.S.A. §§ 2421 - 2430-B (Supp.'g S.M.F. ¶¶ 5-7.)

The parties first met in 2009 at an attorney's office in August, Maine. (Supp.'g S.M.F. ¶ 9.) At this meeting, the parties did not discuss going into business together. (Supp.'g S.M.F. ¶ 10.) The parties next met at the Expo Center in Los Angeles, California at the "THC Expo" and had dinner that evening. (Supp.'g S.M.F. ¶¶ 11, 13.) During this interaction, the parties again did not discuss doing business together, but generally "discussed the industry." (Supp.'g S.M.F. ¶¶ 12-14.)

Around this time, the State of Maine was accepting applications for licenses to operate medical marijuana dispensaries pursuant to the newly enacted Medical Use of Marijuana Act. (Supp.'g S.M.F. ¶ 15.) The first deadline for applications was June 20, 2010. (Supp.'g S.M.F. ¶ 15.) Peterson submitted an application on behalf of Canuvo, then named Safe Harbor Maine, prior to the deadline, only assisted by his wife, Sage Peterson. (Supp.'g S.M.F. ¶¶ 15-16.) Additionally, Infosecurus aided another company, First Sun Patients Group, submit another application for a license. (Supp.'g S.M.F. ¶ 17.) Both applications failed to receive a passing score and were rejected. (Supp.'g S.M.F. ¶¶ 18-19.)

After the first round of applications, the Shelzis approached Peterson to discuss jointly submitting an application to the second round of applications. (Supp.'g S.M.F. ¶ 20.) The parties

2

met on the July 18, 2010 at the Porthole Restaurant in Portland, Maine to discuss potential collaboration. (Supp.'g S.M.F. ¶ 21.)

Plaintiffs contend that at this meeting, the parties reached an oral agreement (the "Agreement") to jointly submit an application and to enter into business together if the application is approved. (Supp.'g S.M.F. ¶ 22.) Vincent testified that pursuant to this Agreement, the Shelzis would secure a lease or purchase a location for the dispensary, hire Infosecurus to provide consulting services, and pay the license fee. (Supp.'g S.M.F. ¶ 23.) Although Vincent originally testified that at this meeting, the parties agreed that the Shelzis would engage and pay a professional writer to draft the application, Joseph testified that this provision was not agreed upon until after the meeting and Vincent later testified that he could not remember when the parties agreed to hire the writer. (Supp.'g S.M.F. ¶ 30.)

In exchange, the Shelzis would be able to appoint some of the members of Canuvo's board of directions (the "Board").[1] (Supp.'g S.M.F. ¶ 24.) The basic terms of the Agreement, however, were to be memorialized in a later writing. (Supp.'g S.M.F. ¶ 25.) As Joseph stated, "[T]he meeting at the Porthole was not real specific. So we agreed to the spirit of the arrangement, agreement, contract; and then, as time moved forward, we began filling in the details." (Supp.'g S.M.F. ¶ 29.)

After the Porthole meeting, the parties and their attorneys began drafting proposed written contracts to be signed once the parties agreed on the specific provisions. (Supp.'g S.M.F. ¶ 33.) Plaintiffs contend that these contracts were only to "memorialize" the oral Agreement.[2] (Opp.

---

[1] The parties dispute how many members the Shelzis would be able to appoint. Plaintiffs contend that they agreed that both Vincent and Joseph would each be able to appoint one third of Canuvo's Board. (Opp. S.M.F. ¶ 24.) On the other hand, defendants claim that both Vincent and Joseph together would only be able to appoint one third of the Board. (Supp.'g S.M.F. ¶ 24.) For the purposes of the instant motion for summary judgment, this disputed fact is immaterial.

[2] Plaintiffs deny or qualify many of defendants' statements of material fact outlining the exchange of contract drafts on the basis that they were not new agreements, but final manifestations of the original oral Agreement. (Opp. S.M.F. ¶¶ 39-60.) To the extent that such denials or qualifications are based upon this ground, they are legal conclusions insufficient to contradict defendants' properly supported statements.

S.M.F. ¶ 33.) The first draft was sent from plaintiffs' attorney to the defendant's attorney on August 10, 2010. (Supp.'g S.M.F. ¶ 38.) The second draft was sent from plaintiffs' attorney to defendants' attorney on August 12, 2010. (Supp.'g S.M.F. ¶ 47.) Peterson then sent another draft contract to the Shelzis later on the evening of August 12. (Supp.'g S.M.F. ¶ 51.) On August 17, 2010, plaintiffs' attorney sent another draft to defendants' attorney. (Supp.'g S.M.F. ¶ 53.) Finally, defendants' attorney sent the last draft of the contract to plaintiffs' attorney on August 18, 2010. (Supp.'g S.M.F. ¶ 59.)

Throughout this exchange of drafts, multiple terms of the contract were added and/or modified. (Supp.'g S.M.F. ¶¶ 49, 52, 54-56, 59.) The first four drafts did not have signature lines. (Supp.'g S.M.F. ¶¶ 43, 50, 52, 57.) The last draft circulated on August 18 had signature lines for Vincent, Joseph, and Glenn, but did not reference Infosecurus or any of Canuvo's former names. (Supp.'g S.M.F. ¶ 60.)

In addition to exchanging draft contracts, the parties agreed to hire a professional writer to prepare the application in compliance with statutory requirements. (Pl.'s Add'l S.M.F. ¶ 29.) The Shelzis advertised the position on craigslist and interviewed applicants, eventually hiring Joseph Mellone, Jr. (Pl.'s Add'l S.M.F. ¶¶ 28-30.) Additionally, plaintiffs claim they acted pursuant to the agreement by meeting with city officials and securing real estate for the dispensary, placing a $500 deposit on a parcel in Biddeford. (Pl.'s Add'l S.M.F. ¶¶ 13-17.)

While preparing the application, Mellone worked closely with the Shelzis and Peterson. (Pl.'s Add'l S.M.F. ¶ 34.) Around August 13, 2010, Mellone received his first payment from Infosecurus in the amount of $1,125. (Pl.'s Add'l S.M.F. ¶ 38.) Peterson, however, also told Mellone that he would pay Mellone $2,600 directly. (Pl.'s Add'l S.M.F. ¶ 38.) Additionally,

4

Peterson instructed Mellone to create a color original and make another six copies for Canuvo's Board members. (Pl.'s Add'l S.M.F. ¶ 44.)

On August 20, the deadline for the second round of applications, the parties met one final time to discuss the application. (Supp.'g S.M.F. ¶¶ 62-63.) The parties and Mellone had worked together late into the night before to complete the application. (Pl.'s Add'l S.M.F. ¶ 42.) Before the meeting, Vincent paid Mellone the remaining balance of his writing fee, $3,050. (Pl.'s Add'l S.M.F. ¶ 45.)

At this meeting, Peterson offered again to allow the Shelzis to collectively appoint one third of the Board members to finalize the contract. (Supp.'g S.M.F. ¶ 64.) Vincent brought a copy of what he considered final draft contract to the meeting, expecting the parties to sign it.[3] (Supp.'g S.M.F. ¶ 65.) However, the parties did not sign any version of the contract and both stated that they did not intend to file the application. (Supp.'g S.M.F. ¶¶ 67-68.)

After the meeting, however, Peterson claims he changed his mind and decided to submit the application on his own behalf just prior to the deadline. (Supp.'g S.M.F. ¶ 70-72.) This time, the application was accepted and Canuvo was granted a license. (Pl.'s Add'l S.M.F. ¶ 74.)

Defendants did not learn of the application until several days after its submission.[4] According to Mellone, Peterson contracted him only a few hours after the meeting, stating that the deal was off and that he would pay Mellone and submit the application himself. (Pl.'s Add'l S.M.F. ¶ 46.) Accordingly, Peterson paid Mellone another $2,575 in cash later in the evening of August 20. (Pl.'s Add'l S.M.F. ¶ 48.) Mellone told the Shelzis of these payments on August 23, 2010, at

---

[3] Vincent cannot find a copy of this contract or identify how it differed from the earlier drafts. (Supp.'g S.M.F. ¶ 66.)
[4] The parties dispute when exactly the Shelzis received notice. Plaintiffs claim they learned of the application on September 1, 2012, after receiving an y email from Joseph Mellone. (Opp. S.M.F. ¶ 73.) Defendants, however claim that plaintiffs received notice within three or four days at most, citing that applications for medical marijuana dispensary licenses are public information. (Supp.'g S.M.F. ¶¶ 73-74.) Again, for the purposes of the instant motion, this fact is immaterial.

which point Mellone purchased a cashier's check payable to Peterson for the total amount he received from Peterson. (Pl.'s Add'l S.M.F. ¶ 51.)

Ultimately, the Shelzis never purchased or leased property for the dispensary and did not pay the application fee. (Supp.'g S.M.F. ¶¶ 77-78.) However, the Shelzis found and submitted a deposit on a property in Biddeford for the dispensary and also located a secondary property in Arundel. (Opp. S.M.F. ¶ 77.) Further, the Shelzis claim they were ready, willing, and able to submit the application fee. (Opp. S.M.F. ¶ 78.)

On August 15, 2016, the plaintiffs filed the instant Complaint, alleging Fraud and/or Fraudulent Concealment (Count I), Negligent Misrepresentation (Count II), Breach of Contract (Count III), Quantum Meruit (Count IV), Unjust Enrichment (Count V), and Promissory Estoppel (Count VI). On October 20, 2017, defendants moved for summary judgment on all claims.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, based on the parties' statements of material fact and the cited record, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. M.R. Civ. P. 56(c); *Dyer v. Dep't of Transp.*, 2008 ME 106, ¶ 14, 951 A.2d 821. "A material fact is one that can affect the outcome of the case. A genuine issue of material fact exists when the fact finder must choose between competing versions of the truth." *Dyer*, 2008 ME 106, ¶ 14, 951 A.2d 821 (internal citation and quotation marks omitted). When deciding a motion for summary judgment, the court reviews the evidence in the light most favorable to the non-moving party. *Id.* In order to survive defendants' motion for summary judgment, plaintiff must set forth a prima facie case of each element of her cause of action. *Bonin v. Crepeau*, 2005 ME 59, ¶ 8, 873 A.2d 346 (citation omitted).

## III. DISCUSSION

6

### a. Plaintiffs' Statement of Material Fact

#### i. Motion to Strike

In their reply, defendants move to strike plaintiffs' responses to defendant's Statement of Material Fact and plaintiff's additional Statement of Material Fact. In support of this motion, defendants claim that fewer than ten of plaintiffs' responses rely on evidence other than plaintiffs' own pleadings, deposition testimony and accompanying exhibits, and/or interrogatory responses for support. They further argue that the denials and qualifications are largely based on legal argumentation, not properly supported facts. Finally, defendants argue that plaintiffs' newly produced affidavits must be excluded because they contradict their own prior deposition testimony in violation of *Zip Lube v. Coastal Sav. Bank*, 1998 ME 81, 709 A.2d 733.

Generally, motions to strike factual assertions, denials, or qualifications made in statements of material fact are not permitted. M.R. Civ. P. 56(i)(1). To the extent defendants contend that the court should not consider facts, denials, or qualifications, the court will consider defendants' objections. *See id.* However, defendants' motion to strike is denied.

#### i. Plaintiffs' Affidavits

Defendants specifically challenge plaintiffs' affidavits submitted in opposition to defendants' motion for summary judgment because of the rule announced in *Zip Lube*, 1998 ME 81, 709 A.2d 733, that "a party will not be permitted to create an issue of material fact in order to defeat a summary judgment motion simply by submitting an affidavit disputing his own prior sworn testimony." *Id.* ¶ 10 (citing *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994)); *see also Blue Star Corp. v. CKF Props., LLC*, 2009 ME 101, ¶¶ 33-34, 980 A.2d 1270.

In addition to conflicting testimony, defendants argue that the court should disregard plaintiffs' affidavits to the extent they discuss topics that were covered at their deposition. To the

7

extent that plaintiffs' affidavits dispute their own prior sworn testimony, the court will disregard the affidavits. However, if the affidavits do not contradict the deposition testimony, but instead discusses topics that may have also been discussed at deposition but does not contradict their prior testimony, the court declines to exclude the affidavits.

### b.  Fraud and/or Fraudulent Concealment (Count I)

In Count I, plaintiffs allege that Peterson committed fraud by failing to disclose that he filed the application. (Compl. ¶ 27.) In their opposition to Defendants' motion for summary judgment, plaintiffs also claim that Peterson perpetrated fraud against them by inducing them to complete the license application in reliance on his representations made at the Porthole Restaurant and thereafter that an agreement had been reached. (Pl.'s Opp. 2-3.) Specifically, plaintiffs claim that they continued to perform their obligations under their initial oral Agreement by meeting with public officials, identifying and placing a deposit on a suitable location for the dispensary, and finding and working with a professional writer to complete the application. (Pl.'s Opp. 2-3.)

To prevail on a claim of fraud, plaintiffs must prove by clear and convincing evidence: "(1) that [Peterson] made a false representation; (2) of a material fact; (3) with knowledge of its falsity or in reckless disregard of whether it is true or false; (4) for the purpose of inducing [plaintiffs] to act in reliance upon it; and (5) [plaintiffs] justifiably relied upon the representation as true and acted upon it to [their] damage." *Me. Eye Care Assocs., P.A. v. Gorman*, 2008 ME 36, ¶ 12, 942 A.2d 707 (citation omitted).

### i.  Material Misrepresentations

In their opposition to defendants' Motion for Summary Judgment, plaintiffs point to Peterson's statements that: (1) he would sign an agreement which manifested the terms of the parties' continuing relationship; and (2) when the parties could not come to terms on a final

8

arrangement during the August 20, 2010 meeting, he would not submit an application. (Pl.'s Opp. 4.) Plaintiffs contend these statements were made with knowledge of their falsity because of Peterson's clandestine interactions with Mellone, indicating Peterson's intent not to go into business with the plaintiffs, but to submit the completed application on his own behalf. (Pl.'s Opp. 4-5.)

Defendants argue that the complaint does not allege any active misrepresentations by Peterson, only the failure to disclose his true intentions constituting fraudulent concealment. Count I Plaintiffs' Complaint alleges: "The Defendants' methods used to obtain their application submitted to the State of Maine Health and Human Services Department were obtained by the use of fraud against the Plaintiffs. The Defendant failed to disclose or notify them that he was filing the application, which was a material fact when he had a duty to disclose and the Plaintiffs suffered damages as a result of the Defendant's fraudulent concealment." (Compl. ¶ 27.)

Rule 8 of the Maine Rules of Civil Procedure requires a pleading to provide "a short and plain statement of the claim showing that the pleader is entitled to relief, and . . . a demand for judgment for the relief which the pleader seeks." M.R. Civ. P. 8(a). The purpose of this section is to provide the opposing party "fair notice of the claim." *Polk v. Town of Lubec*, 2000 ME 152, ¶ 18, 756 A.2d 510, *quoting E.N. Nason, Inc. v. Land-Ho Dev. Corp.*, 403 A.2d 1173, 1177 (Me. 1979). Consequently, matters not pleaded in the complaint are not properly raised for the first time in a motion for summary judgment. *See id.*; *Heller v. Coyne*, No. RE-10-278, 2011 Me. Super. LEXIS 71, *1 (April 6, 2011). This principle is even more poignant here because fraud must be pled with particularity rather than simply in accordance with Maine's general notice pleading standard. M.R. Civ. P. 9(b).

9

Plaintiffs' Complaint makes no reference to any affirmative representations. It only alleges that Peterson did not inform plaintiffs that he was filing an application and that he had a duty to do so. (Compl. ¶ 27.) To the extent that plaintiffs seek to bring a claim of fraud based on any affirmative representations from Peterson, that cause of action was not sufficiently pleaded with particularity in the Complaint and plaintiffs may not assert it now.

### ii. Fraudulent Concealment

As stated above, plaintiffs' Complaint asserts that Peterson never revealed to them that he was submitting the license application. (Compl. ¶ 27.) To prove fraudulent concealment, i.e. the failure to disclose a material fact, a plaintiff must prove by clear and convincing evidence: "(1) a failure to disclose; (2) a material fact; (3) where a legal or equitable duty to disclose exists; (4) with the intention of inducing another to act or to refrain from acting in reliance on the non-disclosure; and (5) which is in fact relied upon to the aggrieved party's detriment." *Picher v. Roman Catholic Bishop of Portland*, 2009 ME 67, ¶ 30, 974 A.2d 286 (citations omitted).

Defendants argue that plaintiffs cannot sustain such a claim because there was no legal or equitable duty to disclose. A duty to disclose exists where there is a fiduciary or confidential relationship between the parties. *Id.* (citing *Morrow v. Moore,* 98 Me. 373, 57 A. 81 (1903)). Here, the facts show that there was no confidential or fiduciary relationship between the parties, only a business relationship. This relationship does not give rise to fiduciary duties. *See Bryan R. v. Watchtower Bible & Tract Soc'y, Inc.*, 1999 ME 144, ¶ 20, 738 A.2d 839 ("Although a fiduciary duty may be based on 'moral, social, domestic, or[] merely personal [duties],' it does not arise merely because of the existence of kinship, friendship, business relationships, or organizational relationships" (citation omitted)). Thus, plaintiffs cannot sustain a fraudulent concealment claim. Summary Judgment on Count I is granted.

10

### c. Negligent Misrepresentation (Count II)

In Count II of their Complaint, plaintiffs assert a claim for negligent misrepresentation. One commits negligent misrepresentation when one "in the course of his business, profession or employment, *or in any other transaction in which he has a pecuniary interest*, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." *Chapman v. Rideout*, 568 A.2d 829, 830 (Me. 1990) (quoting Restatement (Second) of Torts § 552(1) (1977)) (emphasis in original). Similar to fraud claims as discussed above, "silence rises to the level of supplying false information when such failure to disclose constitutes the breach of a statutory duty." *Binette v. Dyer Library Ass'n*, 688 A.2d 898, 903 (Me. 1996).

First, defendants argue that they had no duty to disclose information to the plaintiffs, that no material information was withheld, and that there is no evidence that plaintiffs relied on any misrepresentations. (Def.'s Mot. Summ. J. 17.) Defendants also argue that this court should limit the scope of negligent misrepresentations to instances where a defendant provides advice to a plaintiff to guide that person's business with a third-party, as other states have done.[5] (Def.'s Mot. Summ. J. 17 (citing *Kupper v. Powers*, 71 N.E.3d 347, 348 (Ill. App. Ct. 2017); *Livery Coach Sols., LLC v. Music Express/East, Inc.*, 245 F. Supp.3d 639, 646 (D. Del. 2017)).)

Plaintiffs claim that defendants are liable for negligent misrepresentation because Peterson consistently told them that he would sign a written contract. (Pl.'s Opp. 7; Pl.'s Add'l S.M.F. ¶¶ 51, 54.) Defendants, on the other hand, contend that this contention contradicts their former deposition testimony and is unsupported in plaintiffs' statement of material fact. (Def.'s Repl. 3.)

---

[5] Plaintiffs did not address this argument in their opposition. Defendants contend that this amounts to a waiver of any argument on the issue and that summary judgment is thus proper. (Def.'s Repl. 2.)

11

Paragraph 51 of plaintiffs' statement of additional material facts states, "That although the parties' attorneys continued to 'fine tune' the Agreement reached at the Porthole on July 18, 2010, Glenn continued to reassure the Shelzis 'not to worry' and that a final Agreement for signature was forthcoming and not to stop working on the dispensary application." (Pl.'s Add'l S.M.F. ¶ 51.) Paragraph 54 similarly provides, "That . . . Glenn reassured the Shelzi's (sic.) than (sic.) an Agreement was in place and would be ready for signature prior to the submission of the Dispensary Application. (Pl.'s Add'l S.M.F. ¶ 54.) Plaintiffs support both statements by citing to paragraphs 25 and 26 of Joseph's affidavit and paragraphs 24 through 28 of Vincent's affidavit. (Pl.'s Add'l S.M.F. ¶¶ 51, 54.) The only paragraphs in Vincent's affidavit that arguably supports the statements are paragraphs 27, which states, "Glenn kept reinforcing this [fact that the parties had a deal in place] to use (sic.) and told us there were no issues, and to keep working on the project" and 28, which provides, "Accordingly, and based on Glenn's representations that we had a deal in place and not to worry Joseph and I provided all of our time and monies needed to get to (sic.) the final application completed." (Vincent Shelzi Aff. ¶¶ 27-28.) Joseph's affidavit similarly states, "Accordingly, and based on representations by Glenn Peterson that we had a deal in place, Vincent and I provided all the money needed to get the final Application completed, and fulfilled all the obligations agreed upon, with Glenn Peterson relying on his assurances we had a deal in place, and not to worry about the formal writing, it was coming." (Joseph Shelzi Aff. ¶ 26.)

Defendants claim that plaintiffs' affidavits contradict their sworn deposition testimony and must not be considered by the court. *See Zip Lube*, 1998 ME 81, ¶10, 709 A.2d 733 (Def.'s Repl. S.M.F. ¶¶ 51, 54.) In support, defendants cite to plaintiffs' interrogatory responses. (Def.'s Ex. E.) When asked to describe any false information supplied by Peterson, plaintiffs answered, "Peterson

12

assurance that he was not going to file an application was the false information." (Def.'s Ex. E ¶ 17.)

Plaintiff's interrogatory responses clearly contradict with their affidavits. Plaintiffs cannot create an issue of material fact at summary judgment based on their affidavits which contradict their interrogatory responses. *Zip Lube*, 1998 ME 81, ¶10, 709 A.2d 733. Thus, the court will not consider the cited portions of their affidavits as support for their argument.

Further, plaintiffs allege that defendants are liable for negligent misrepresentation for failing to disclose material information. (Pl.'s Opp. 6-7.) Again, the failure to disclose information satisfies the misrepresentation prong of the claim only if there is a duty to disclose. *Binette*, 688 A.2d at 903 ("for purposes of *negligent* misrepresentation . . . , although not every failure to disclose constitutes a misrepresentation, silence rises to the level of supplying false information when such failure to disclose constitutes the breach of a statutory duty.") Plaintiffs provide no statutory basis for defendants' duty to disclose. Additionally, as discussed above, the business relationship between the parties does not create a fiduciary duty for defendants to disclose any information. Consequently, plaintiffs cannot support their negligent misrepresentation claim on any failure to disclose.

Because plaintiffs cannot create an issue of material fact by submitting affidavits that contradict their prior sworn testimony and Peterson did not owe plaintiffs any duty to disclose information, summary judgment on Count II is granted.

### d. Breach of Contract (Count III)

Next, plaintiffs allege that defendants breached the contract[6] entered into between the parties by submitting the application on their own. Defendants, however, claim that no contract

---

[6] Plaintiffs refer to the parties' arrangement as a "joint venture" at multiple points in their opposition memorandum and statement of material facts. To the extent that they are asserting a separate claim of relief based on this status, such

13

was formed between the parties and that, even if one was formed, the Statute of Frauds bars the claim.

### i. Statute of Frauds

33 M.R.S.A. § 51(5) provides that no action shall be maintained, "[u]pon any agreement that is not to be performed within one year from the making thereof . . . unless the promise, contract or agreement on which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith . . . ." The statute of frauds is generally meant "to preclude false allegations of contract." *Wells Fargo Home Mortg., Inc. v. Spaulding*, 2007 ME 116, ¶ 20, 930 A.2d 1025 (citation omitted) (quotation marks omitted).

Although a writing is required, "[a] writing that is sufficient to satisfy the requirements of the statute of frauds may be in almost any possible form," including, but not limited to, "a receipt for money paid, letters to either party to the agreement, the record books of the business, or a computer entry." *Id.* (citation omitted). Additionally, a single, complete document is not required, and a combination of several papers and documents, not all of which are signed by the party to be charged and none of which may be a sufficient writing itself. *Id.* (citations omitted).

When determining whether an oral contract is subject to Section 51(5), the court should consider the particular circumstances involved to determine whether "the parties plainly manifested an intent that the contract was not to be performed within one year." *Longcope v. Lucerne in Maine Community Ass'n,* 127 Me. 282, 284, 143 A. 64, 65 (1928).

For example, in *Great Hill Fill & Gravel v. Shapleigh*, 1997 ME 75, 692 A.2d 928, plaintiff sought to enforce an oral agreement that provided that (1) defendant could remove gravel and fill in exchange for twenty cents for each cubic yard removed; and (2) defendant promised to "return

---

a claim has not been pleaded. Thus, the court considers the claims presented in the Complaint without reference to the potential of a "joint venture."

14

the land to the condition of a 'nice, easy slop' when he was finished excavating." *Id.* ¶ 2. However, "[n]either party contemplated that the contract would be performed within one year." *Id.* The Law Court held that although the oral promise could be conceivably be performed within one year, the trial court "correctly looked to the circumstances in this case to conclude that the parties plainly manifested an intent that the contract was not to be performed within one year." *Id.* (citing *Longcope v. Lucerne in Maine Community Ass'n*, 127 Me. 282, 284, 143 A. 64, 65 (1928)).

In this case, Vincent testified that the Agreement reached at the Porthole was to enter into business with Peterson for an extended period of time, and at least "longer than a year." (Supp.'g S.M.F. ¶ 79.) The terms in the written draft contract also could not be performed within a year.[7]

Because the parties clearly manifested an intent for their relationship to last longer than a year and the terms of the contract itself could not be performed within a year, the statute of frauds applies to the instant Agreement.

### 1. Series of Writings

Although plaintiffs seem to acknowledge that 33 M.R.S.A. § 51(5) applies to the instant Agreement, they claim that the statute of frauds is satisfied by a series of writings: the draft contracts and emails between the parties. (Pl.'s Opp. 9.) Further, plaintiffs claim that the defendant's designation that the last draft sent to plaintiffs was the "final draft" operates as a binding signature. (Pl.'s Opp. 9.) The court cannot agree.

Although a series of writings can satisfy the statute of frauds, at least one must still be signed by the party to be charged. *Wilson v. DelPapa*, 634 A.2d 1252, 1254-55 (Me. 1993)

---

[7] The last iteration of the draft contract provides that Glenn Peterson was to be employed at an annual salary, that the Shelzis were to provide a $350,000 line of credit to be available for three years, that the members must agree on the appointment of the Board of Directors for the first four years, and thereafter that a majority would prevail, and other provisions that would remain in effect longer than one year. (Def.'s Ex. J.)

15

(citations omitted); Restatement (Second) of Contracts § 132 (1981) ("The memorandum may consist of several writings *if one of the writings is signed* and the writings in the circumstances clearly indicate that they relate to the same transaction." (emphasis added)).

Plaintiffs contend that the designation on the third and fourth draft contracts as "final" constitutes a signature satisfying the statute of frauds. (Pl.'s Opp. 9.) However, this designation cannot operate as a signature for statute of frauds purposes as it does not evince an assent to be bound by the terms of the agreement. Additionally, the parties went on to modify the agreement by changing essential terms and circulating a fifth iteration which was not designated as "final", which indicates that these drafts were indeed not a final manifestation of the parties' agreement. (Supp.'g S.M.F. ¶¶ 51-57.) Thus, there is no sufficient signed writing and the statute of frauds applies to bar the breach of contract action. Summary judgment on Count III is granted.

### 2. Main Purpose Exception

Plaintiffs argue the Main Purpose exception applies to take the Agreement out of the statute. However, this exception does not apply to the agreements that are not to be performed within one year of their making; instead, this exception only applies to 33 M.R.S.A. § 51(2) . *Fitzgerald v. Hutchins*, 2009 ME 115, ¶ 22, 983 A.2d 382 (citing *Graybar Elec. Co. v. Sawyer,* 485 A.2d 1384, 1389 (Me. 1985); Restatement (Second) of Contracts § 116 cmt. b (1981)). Thus, the main purpose exception does not bar application of the statute of frauds in this case.

### 3. Part Performance

Next, plaintiffs also argue that their part performance of the contract bars application of the statute of frauds. The Second Restatement of Contracts provides that, generally, "[p]art performance not amounting to full performance on one side does not in general take a contract out of the one-year provision. Restitution is available in such cases, and doctrines of estoppel and fraud

16

may be applicable." Restatement (Second) of Contracts § 130 cmt. e (1981) (citations omitted). The Restatement also explains, "If either party promises a performance that cannot be completed within a year, the Statute applies to all promises in the contract, including those which can or even must be performed within a year." *Id.* cmt. d.

For example, "A and B contract orally for A's employment by B at a stated salary for the ensuing two years. A works under the contract for 15 months when B discharges him without cause. The contract is not withdrawn from the operation of the Statute, and A may not recover damages for wrongful discharge. But A may recover any unpaid salary." *Id.* ill. 15. Likewise, the Law Court has held, "Relief because of the partial or full performance of the contract is usually granted in equity on the ground that the party who has so performed has been induced by the other party to irretrievably change his position and that to refuse relief according to the terms of the contract would otherwise amount to a fraud upon his rights." *Great Hill Fill & Gravel v. Shapleigh,* 1997 ME 75, ¶ 6, 692 A.2d 928 (quoting *Busque v. Marcou,* 147 Me. 289, 295, 86 A.2d 873, 876 (1952)) (quotation marks omitted).

However, the Law Court has further noted, "After having induced or knowingly permitted another to perform in part an agreement, on the faith of its full performance by both parties and for which he could not well be compensated except by specific performance, the other shall not insist that the agreement is void [for lack of a writing]." *Great Hill Fill & Gravel v. Shapleigh,* 1997 ME 75, ¶ 6, 692 A.2d 928 (quoting *Landry v. Landry,* 641 A.2d 182, 183 (Me. 1994)) (quotation marks omitted). This is because "[r]elief because of the partial or full performance of the contract is usually granted in equity on the ground that the party who has so performed has been induced by the other party to irretrievably change his position and that to refuse relief according to the terms of the contract would otherwise amount to a fraud upon his rights." *Id.*

(quoting *Busque v. Marcou,* 147 Me. 289, 295, 86 A.2d 873, 876 (1952)) (quotation marks omitted).

Partial performance of the contract does not prevent the application of the statute of frauds for several reasons. First, to be discussed below, the court finds that the parties did not enter into a contract during their meeting at the Porthole restaurant. Instead, the parties only made an unenforceable agreement to agree. Further, the court is not convinced that this agreement is such that plaintiffs may "not well be compensated except by specific performance." *Id.* (citation omitted). In fact, the court would be unable to determine which of the parties' iterations of their agreement to specifically enforce. Thus, part performance does not remove the current Agreement from the statute of frauds and plaintiffs cannot sustain a breach of contract claim thereupon.

### ii. Agreement to Agree

Next, defendants argue that even if the claim is not barred by the Statute of Frauds, that the agreement reached at the Porthole was simply an unenforceable agreement to agree. In support of this argument, defendants contend that the Agreement omitted several material terms, including: (1) whether and in what amount the principals would draw salary from the dispensary; (2) whether the parties would become members of the entity; (3) whether and to what extent the parties would have a right to appoint Board members; (4) who would perform what tasks in preparing the license applications; and (5) who would be the parties to the Agreement. (Def.'s Mot. Summ. J. 10.)

Generally, preliminary negotiations do not create binding contracts. *McClare v. Rocha,* 2014 ME 4, ¶ 20, 86 A.3d 22 (citations omitted). "Whether the parties are merely negotiating the contract, or entering into a present contract, is purely a question of intention." *Id.* (quoting *Masselli v. Fenton,* 157 Me. 330, 336-337, 172 A.2d 728 (1961)) (quotation marks omitted). Thus, the lack of a formal writing "does not affect the binding nature of a potential contract if the parties intended

18

to close the contract prior to a formal writing." *Id.* (citing *Masselli*, 157 Me. at 335-336; Restatement (Second) of Contracts § 27 (1981)).

The parties' intention is gleaned from the language of any agreement, which the court views "'in the light of the circumstances under which it was made,' including the use of the words 'offer' and 'acceptance.' Other relevant circumstances include the extent to which an express agreement has been reached on all terms to be included; whether the contract is of a type that is usually put in writing; whether it needs a formal writing for its full expression; whether it is a common or unusual contract; whether a standard form of contract is widely used in similar transactions; and whether either party takes any action in preparation for performance." *Id.* ¶ 20 (citations omitted). Additionally, "[i]f a written draft is proposed, suggested or referred to, during the negotiations, it is some evidence that the parties intended it to be the final closing of the contract." *Miss. & Dominion S.S. Co. v. Swift*, 86 Me. 248, 259, 29 A. 1063, 1067 (1894); *see also Kelley v. Me. Eye Care Assocs., P.A.*, 37 F. Supp. 2d 47, 52 (D. Me. 1999).

The Second Restatement of Contracts echoes this rule: "Manifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so operating by the fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; but the circumstances may show that the agreements are preliminary negotiations." Restatement (Second) of Contracts § 27. The comments to Section 27 of the Second Restatement of Contracts are particularly enlightening:

> *a.* Parties who plan to make a final written instrument as the expression of their contract necessarily discuss the proposed terms of the contract before they enter into it and often, before the final writing is made, agree upon all the terms which they plan to incorporate therein. This they may do orally or by exchange of several writings. It is possible thus to make a contract the terms of which include an obligation to execute subsequently a final writing which shall contain certain provisions. *If parties have definitely agreed that they will do so, and that the final*

19

*writing shall contain these provisions and no others, they have then concluded the contract.*

*b.* On the other hand, *if either party knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist until other terms are assented to or until the whole has been reduced to another written form, the preliminary negotiations and agreements do not constitute a contract.*

*Id.* cmts. a, b (emphasis added).

Here, the Agreement reached at the Porthole did not include all of the material terms of the parties' potential business relationship. Joseph to meeting as "not real specific" and that the parties filled in the details "as time moved forward." (Supp.'g S.M.F. ¶ 29.) The parties left the meeting expecting their respective lawyers to draw up written contracts. (Vincent Shelzi Dep. 34:14-17; Vincent Shelzi Aff. ¶ 14.) Further, the parties' exchange of draft agreements included terms that conflicted with the general terms of the oral Agreement as well as new terms that materially alter the relationship, such as the requirement that the Shelzis to provide a $350,000 line of credit, $100,000 of which was meant as initial capitalization, and the employment of Peterson at an annual salary of $50,000, and the limits on the parties' ability to elect directors. (Def.'s Exs. F-J.)

Under these circumstances, there is no question of material fact that the Agreement reached at the Porthole restaurant was not meant to be binding without a further manifestation of assent to be bound in the form of a later written contract that contained the parties' complete agreement.

### iii. Indefiniteness of the Agreement

Finally, defendants argue that any agreement made at the Porthole is too indefinite to be enforced. In order for an agreement to be binding, it "must be sufficiently definite to enable the court to determine its exact meaning and fix exactly the legal liabilities of the parties." *Fitzgerald v. Hutchins*, 2009 ME 115, ¶ 18, 983 A.2d 382 (quoting *Searles v. Trs. of St. Joseph's Coll.*, 1997 ME 128, ¶ 13, 695 A.2d 1206; also citing *Corthell v. Summit Thread Co.*, 132 Me. 94, 99, 167 A.

20

79, 81 (1933); Restatement (Second) of Contracts § 33 (1981)) (quotation marks omitted). Such indefiniteness may relate to any of the agreement's material terms, including "the time of performance, the price to be paid, work to be done, property to be transferred or other miscellaneous stipulations of the agreement." *Id.* (citation omitted).

Although the court may invoke the standard of reasonableness to supplement a needed term, certain agreements with missing or indefinite essential terms may "preclude a reasonably calculable remedy or indicate a lack of contractual intent so as to render an agreement unenforceable." *Id.* ¶ 19 (citing *Ault v. Pakulski*, 520 A.2d 703, 706 (Me. 1987) (*Glassman, J.*, dissenting)).

Again, the court notes that the lack of definite terms of the Porthole Agreement indicates a lack of contractual intent. Thus, the indefiniteness of the agreement likewise prevents the contract from having binding effect.

### e. Quantum Meruit (Count IV)

In Count IV, plaintiffs assert a claim for *quantum* meruit. In order to prove a claim for *quantum meruit*, plaintiff must show "that (1) services were rendered to the defendant by the plaintiff; (2) with the knowledge and consent of the defendant; and (3) under circumstances that make it reasonable for the plaintiff to expect payment." *Bowden v. Grindle*, 651 A.2d 347, 351 (Me. 1994).

Although though traditional formalities of an express contract are not required to recover under *quantum meruit*, there "must be a reasonable expectation on the part of the claimant to receive compensation for his services and a 'concurrent intention' of the other party to compensate him." *Paffhausen v. Balano*, 1998 ME 47, ¶ 9, 708 A.2d 269 (quoting *Estate of White*, 521 A.2d 1180, 1183 (Me. 1987)). The reasonableness test requires "proof that services were

21

rendered under circumstances consistent with contract relations." *Danforth v. Ruotolo*, 650 A.2d 1334, 1335 (Me. 1994). In other words, "[i]t must appear that the one who rendered the services expected compensation and that the one who received or benefitted from the services so understood, and by her words or conduct justified the expectation." *Paffhausen*, 1998 ME 47, ¶ 9, 708 A.2d 269 (citing *Colvin v. Barrett*, 151 Me. 344, 348, 118 A.2d 775, 778 (1955)). "*Quantum meruit* may lie when 'there was not a clear accession on both sides to one and the same terms,' if services are provided 'under circumstances that negative the idea that the services were gratuitous.'" *Id.* (quoting *Colvin*, 151 Me. at 349).

In their motion for summary judgment, defendants argue, "The Shelzis never expected to be paid a fee in connection with their 'services'. Rather, they hoped to go into business with Peterson in the event of a successful application and agreement on contract terms." (Def.'s Mot. Summ. J. 19.) Although they may have never expected to earn a flat fee for their services, there is a question of material fact concerning whether the Shelzis believed that the services were gratuitous or whether they expected to be compensated in some form. Consequently, summary judgment on Count IV is denied.

### i. Damages for *Quantum Meruit*

The court notes that recovery under a theory of *quantum meruit* is more limited than for breach of contract. Specifically, damages arising from *quantum meruit* are measured by the reasonable value of the services that plaintiffs actually provided to defendants. *Mushero, Inc. v. Hull*, 667 A.2d 853, 855 (Me. 1995); *Paffhausen*, 1998 ME 47, ¶ 7, 708 A.2d 269. To the extent that plaintiffs request specific performance or their expectation damages, those damages are unrecoverable should plaintiffs ultimately succeed in their *quantum meruit* claim.

22

### f. Unjust Enrichment (Count V)

Finally, Count V asserts a claim of unjust enrichment. Similar to *quantum meruit*, a party claiming unjust enrichment must establish, "that it conferred a benefit on the other party . . . that the other party had 'appreciation or knowledge of the benefit' . . . and . . . that the acceptance or retention of the benefit was under such circumstances as to make it inequitable for it to retain the benefit without payment of its value." *Forrest Assocs. v. Passamaquoddy Tribe*, 2000 ME 195, ¶ 14, 760 A.2d 1041 (quoting *Howard & Bowie v. Cloutier & Briggs*, 2000 ME 148, ¶13, 759 A.2d 707) (quotation marks omitted). Thus, unjust enrichment allows a successful claimant to recover "for the value of the benefit retained when there is no contractual relationship, but when, on the grounds of fairness and justice, the law compels performance of a legal and moral duty to pay . . . ."*Paffhausen*, 1998 ME 47, ¶ 6, 708 A.2d 269.

Defendants claim "there is nothing 'inequitable' about the Shelzis' failure to consummate such an agreement leading to no benefits of the kind they believe they would have reaped had they been successful. Further, the Shelzis never sought 'value' for their pre-License application contributions, only the possibility of ongoing business collaboration with Peterson should a License be granted." (Def.'s Mot. Summ. J. 19.)

However, there is a question of material fact concerning the parties understanding of the binding nature of the oral Agreement at the Porthole Restaurant. Plaintiffs contend that they believed that Agreement to be contractually binding. As discussed above, the court finds that this Agreement did not amount to a contract and therefore plaintiffs cannot recover under a contractual theory. To the extent that equity requires reimbursement of some kind, however, a question of material fact remains as to whether the circumstances make it inequitable for the defendants to

23

retain the benefit of the plaintiffs' work on the application without payment. Thus, summary judgment on Count V is denied.

### i. Value of the Benefit Conferred

Finally, defendants argue that plaintiffs cannot establish the extent of the benefit that they conferred on the defendants. The damages analysis for unjust enrichment is "based on principles of equity, not contract." *Aladdin Elec. Assocs. v. Town of Old Orchard Beach*, 645 A.2d 1142, 1145 (Me. 1994). Thus, damages in unjust enrichment are measured by the value of the benefit inequitably retained. *Paffhausen*, 1998 ME 47, ¶ 7, 708 A.2d 269 (citing *Aladdin Elec. Assocs.*, 645 A.2d at 1145).

In support of their argument, defendants point the court to *Forrest Assocs. v. Passamaquoddy Tribe*, 2000 ME 195, 760 A.2d 1041. In *Forrest Assocs.*, plaintiff aided defendant Tribe in the development of a bingo operation. *Id.* ¶ 2. Although plaintiff asked the defendant to sign an engagement letter, defendant never did. *Id.* As the plaintiff understood the parties' agreement, plaintiff was to complete the initial phase of the project before payment, assuming the risk that the Tribe may decide not to pursue the project. *Id.*

When plaintiff ultimately presented the proposal to the defendant, plaintiff's employee stated that "recapture of those fees is provided that the project turns into a reality." *Id.* ¶ 5. Although plaintiff represented that the project needed funding immediately, defendant was reluctant. *Id.* Although the parties ended this meeting contemplating a formal agreement, one never materialized. *Id.* ¶¶ 5-6. Plaintiff, however, continued to work on the project by soliciting bids and locating financing. *Id.* ¶ 6.

Ultimately, defendant informed plaintiff that it would not provide short-term funding to the project and that work would soon stop for the winter. *Id.* Defendant never paid plaintiff for any of

24

the work done and the facility was never built. *Id.* However, two years later, defendant obtained a financing commitment for the project from a third-party. *Id.* ¶ 7. Defendant contended that it did not use any of plaintiff's work product to obtain financing, but plaintiff argued that the development costs were virtually the same and that the defendant had continued access to the proposal when making the design decisions for the new facility. *Id.*

The trial court found defendant liable for unjust enrichment. On appeal, however, the Law Court held, "Although [plaintiff] created the comprehensive plan and presented it to the [defendant], there is no evidence that the [defendant] benefitted from either the presentation or the information contained in the plan. To the contrary, the evidence demonstrates that [plaintiff] made an elaborate marketing proposal to the [defendant] that was ultimately rejected. Such evidence fails to satisfy the central element of proving a benefit conferred." *Id.* ¶ 15. Thus, the Law Court reversed the trial court. *Id.*

Defendants contend that, as in *Forrest Assocs.*, plaintiffs here have not provided evidence "establishing what alterations were made between the original License application that fell just short of approval and the second License application." (Def.'s Mot. Summ. J. 20.) However, there is a much stronger link between the work performed by plaintiffs and the benefit received by the defendants in this case than in *Forrest Assocs.* Plaintiffs here worked directly on the application that was ultimately submitted. Although there is no direct evidence of the difference between the first application and the second application, there is circumstantial evidence indicating that a benefit indeed was conferred, including the facts that the second application was rewritten by Mellone with plaintiffs' (and Peterson's) aid, that the plaintiffs met with town officials to support the application, and that the application was ultimately accepted. (Pl.'s Add'l S.M.F. ¶¶ 13-17, 28-

25

30, 74.) Further, when asked in interrogatories to list all the benefits plaintiffs allege they gave to defendants, plaintiffs responded:

A. Joseph Mellone $5,000.00
B. Daigle option $500.00 for Biddeford real estate
C. Infosecurus employees were paid for work on the Safe Harbor Maine, Inc. See attached Exhibit 24-1[8].
D. Time incurred by Vincent Shelzi. See attached Exhibit 24-2[9].
E. Time incurred by Joseph Shelzi. See attached Exhibit 24-3[10].

(Pl.'s Ex. 20 ¶ 24.)

Given the above evidence, there is a question of material fact concerning whether there was benefit conferred on the defendants. Summary judgment on Count V is denied.

## 1. Expert Testimony

Defendants also argue that expert testimony is necessary for the Selzis to establish the benefit conferred. In support, they cite to *Maravell v. R.J. Grondin & Sons*, 2007 ME 1, ¶ 11, 914 A.2d 709, where the Law Court held, "In determining the nature of the appropriate standard of care or practice, expert testimony may be necessary where the matter in issue is within the 'knowledge of experts only, and not within the common knowledge of lay[persons].' '[E]xpert testimony may not be necessary[, however,] 'where the negligence and harmful results are sufficiently obvious as to lie within common knowledge. . . .'" *Id.* ¶ 11 (citations omitted).

---

[8] Attached Exhibit 24-1 states that plaintiffs are entitled to damages for Infosecurus employees paid in the amount of $24,671.07. (Pl.'s Ex. 20.) However, the large majority of the hours that plaintiffs claim as damages were sustained before the contract was allegedly entered in to on July 18, 2010. In fact, only 10.5 hours of the 662.75 claimed were sustained from July 18 to August 20, 2010. (Pl.'s Ex. 20.) Additionally, the provided records do not state exactly what these hours were spent on and for which client, only commenting that the hours were for "research/reading" or "research/reading/marketing plan brainstorming." (Pl.'s Ex. 20.)

[9] Attached Exhibit 24-2 provides a computation of damages concerning Vincent's alleged entitlement to "1/3 of the significant wages paid by Canuvo from 2013-2016, totaling $598,059.61." (Pl.'s Ex. 20.) It also states that Vincent spent 120 hours from June 2010 through August 29, 2010 working on the application, at a total value of $12,000. (Pl.'s Ex. 20.) Similarly, the document also lists that Vincent seeks $20,000 in damages for time incurred after the submission of the application. (Pl.'s Ex. 20.) Finally, Vincent also seeks $5,000 for legal fees paid in 2010 to "advise and research case." (Pl.'s 20.)

[10] Exhibit 24-3 to plaintiffs' Exhibit 20 essentially mirrors Exhibit 24-2, except it replaces Vincent with Joseph. (Pl.'s Ex. 20.) The amount of hours Joseph worked are the exact same as Vincent's and the total amount of calculated damages is also the same, minus the $5,000 in legal fees. (Pl.'s Ex. 20.)

26

Putting aside the differences between establishing a benefit conferred and the appropriate standard of care in a professional negligence action, the court finds that the benefit conferred is "sufficiently obvious as to lie within common knowledge" such that expert testimony is not required to prove its existence.

### g. Promissory Estoppel (Count VI)

Finally, defendants claim that plaintiffs cannot maintain an action for promissory estoppel. Specifically, defendants contend that, like their breach of contract claim, the Statute of Frauds bars plaintiffs' promissory estoppel claim.

Promissory estoppel has been defined as "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires." *Chapman v. Bomann*, 381 A.2d 1123, 1127 (Me. 1978) (citing Restatement (Second) of Contracts § 90). However, plaintiffs in the employment context are not allowed to circumvent the statute of frauds requiring the written manifestation of an agreement not to be performed within one year from the making thereof by asserting a promissory estoppel argument. *Popanz v. Peregrine Corp.*, 1998 ME 95, ¶ 6, 710 A.2d 250 (citing *Stearns v. Emery-Waterhouse Co.*, 596 A.2d 72, 74 (Me. 1991)). The court is convinced that this situation, an agreement to enter into an ongoing business relationship, is sufficiently similar to an employment agreement such that this precedent applies to likewise forbid plaintiffs from using promissory estoppel to prevent the application of the statute of frauds. Thus, summary judgment on Count VI is granted.

27

### h. Claims by Infosecurus Against Canuvo

In addition to requesting summary judgment on each of plaintiffs' separate claims for relief, defendants argue that summary judgment should be granted in favor of Canuvo and against all claims asserted by Infosecurus because there is no indication that either corporate entity was involved in the instant conduct. In their opposition, plaintiffs did not address defendants' arguments.

"The failure to mention an issue in the brief or at argument is construed as either an abandonment or a failure to preserve that issue." *Holland v. Sebunya*, 2000 ME 160 n.6, 759 A.2d 205 (citations omitted). Because plaintiffs did not address the issue, they have deemed to have abandoned and/or waived any argument on the matter. Thus, summary judgment in favor of Canuvo and against Infosecurus on all claims is granted.

## IV. CONCLUSION

For the reasons set forth above, the defendant's motion for summary judgment is hereby granted in part and denied in part. Judgment is granted as to Counts I, III, and VI and denied as to Counts II, IV, and V. Judgment in favor of defendant Canuvo, Inc. on all counts is granted. Further, defendants' motion for summary judgment is granted for all claims asserted by plaintiff Infosecurus, Inc. Finally, defendants' motion to strike is denied.

The clerk shall make the following entry on the docket:

Defendants' motion for summary judgment is GRANTED as to Counts I, II, III, and VI.
Defendants' motion for summary judgment is DENIED as to Counts IV and V.
Defendants' motion for summary judgment is GRANTED as to all claims against defendant Canuvo, Inc.
Defendants' motion for summary judgment is GRANTED as to all claims brought by plaintiff Infosecurus, Inc.
Defendants' motion to strike is DENIED.

SO ORDERED.

DATE: MAY _16_, 2018

ENTERED ON THE DOCKET ON:_5/17/18_

John O'Neil, Jr.
Justice, Superior Court

29

ALFSC-AP-16-203


ATTORNEYS FOR PLAINTIFFS:

PATRICK BEDARD, ESQ.
BEDARD & BOBROW
PO BOX 366
ELIOT  ME  03903


JAY SHEEHAN, ESQ., PRO HAC VICE
37 DUTTON ROAD
PELHAM  NH  03076


ATTORNEY FOR DEFENDANTS:

DAVID GOLDMAN, ESQ.
NORMAN HANSON & DETROY
PO BOX 4600
PORTLAND  ME  04112